## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| Juliett Davis, et al. | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:08-cv-03874-JOF |
| ReliaStar Life Insurance Co, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## OPINION & ORDER

This matter is before the court on Defendant's motion for summary judgment [15] and Defendant's motion to strike Plaintiff's jury demand [16].

## I.    Background

### A.    Facts and Procedural History

Defendant ReliaStar Life Insurance Co. "issued a group, long-term disability insurance policy" to Piedmont Healthcare, Inc., which made certain Piedmont employees eligible for long term disability benefits. Docket Entry [18], Ex. 2, ¶ 1.  Plaintiff Juliet Davis "became eligible for coverage . . . on February 3, 2003, by virtue of her employment with Piedmont as a patient care technician." D.E. [18], Ex. 2, ¶ 11.  On October 26, 2007, Plaintiff made a claim under the group policy, filling out a "Long Term Disability

Employee's Statement." D.E. [15], Ex. B, Part 2, RS000251. Plaintiff stated that her disability was caused by a motor vehicle accident that occurred on May 6, 2007, and her disability started on May 9, 2007. *Id.*

Under the policy, an employee must be "disabled" to qualify for long term disability benefits, and an employee is considered disabled if ReliaStar determines that

> [A] change in [the employee's] functional capacity to work due to accidental injury . . . has caused the following: During the benefit waiting period and the following 24 months, [the employee's] inability to perform the essential duties of [her] **regular occupation**[1] and as a result [she] is unable to earn more than 80% of [her] indexed basic monthly earnings.

D.E. [15], Ex. A, 16 (emphasis added). The policy gives Defendant "final discretionary authority" regarding any questions of eligibility for benefits. D.E. [18], Ex. 2, ¶ 8. On January 4, 2008, Defendant approved Plaintiff for benefits from August 21, 2007 to October 29, 2007, but denied her claim for benefits after October 29, 2007, concluding that she was able to perform her essential job duties after that point. D.E. [18], Ex. 2, ¶ 34. Plaintiff

---

[1] Piedmont provided Defendant with an Occupational Demands form, describing Plaintiff's essential job duties. D.E. [15], Ex. B, Part 2, RS000241. Those tasks included being able to pick up something weighing six to ten pounds twelve times a day and something weighing twenty-six to fifty pounds thirty times a day, being able to carry something weighing one to five pounds twelve times a day and something weighing one hundred pounds or more twice a day. *Id.* The physical demands also included twelve hour days, three days a week, with twenty percent of work time spent standing, thirty percent spent sitting, and fifty percent spent walking. *Id.*

AO 72A
(Rev.8/82)

appealed the decision, *id*. at ¶ 38, but Defendant upheld its original denial and termination of her benefits. *Id*. at ¶ 68.

The Employee's Statement filled out by Plaintiff stated that she first saw a physician for her injury on May 9, 2007, and that her treating physician at the time she filled out the statement was Dr. Kamal Kabakibou. D.E. [15], Ex. B, Part 2, RS000251. After receiving Plaintiff's claim, Defendant sent a request to Dr. Kabakibou for all of Plaintiff's medical records from January 1, 2007 to November 7, 2007. D.E. [18], Ex. 2, ¶ 20. Dr. Kabakibou eventually produced Plaintiff's medical records. *Id*. at ¶ 23. According to those records, Dr. Kabakibou's initial visit with Plaintiff occurred on August 21, 2007. *Id*. at ¶ 15. There appears to be no record of any medical treatment or doctor visits before this date – including the physician's visit that Plaintiff, in her claim, stated occurred on May 9, 2007.

In his initial evaluation of Plaintiff, Dr. Kabakibou noted that Plaintiff complained of "back pain with radiation of pain in lower extremities." D.E. [15], Ex. B, Part 2, RS000222. Dr. Kabakibou also wrote that Plaintiff's "work ability has been extremely decreased and diminished . . . ." *Id.* Dr. Kabakibou assessed Plaintiff as suffering from "[l]ow back pain . . . myofascial-type[2] pain[,] . . . [and] depression." *Id*. The doctor further

---

[2] "Myofascial pain syndrome is an irritation of the muscles and fascia of the back and neck causing acute and chronic pain not associated with neurologic or bony evidence of disease." *Saunders v. Astrue*, No. 1:07CV800-CSC, 2008 WL 2358735, at *5 n. 15 (M.D. Ala. June 6, 2008).

AO 72A
(Rev.8/82)

wrote that "patient is considered to be totally disabled and is not able to do any work." *Id.* at RS000223.

Plaintiff had a lumbar spine MRI on September 17, 2007, performed by Dr. R. Darr McKeown, the results of which were included in the medical records sent to Defendant by Dr. Kabakibou. D.E. [18], Ex. 2, ¶ 27. *See also* D.E. [15], Ex. B, Part 2, RS000221. The MRI was "essentially negative." D.E. [15], Ex. B, Part 2, RS000221. There was, however, "some very mild facet[3] degeneration at L5-S1."[4] *Id.* Plaintiff saw Dr. Kabakibou for a follow-up visit on September 26, 2007. *Id.* at RS000217. Plaintiff complained of hip pain, and Dr. Kabakibou ordered an MRI of Plaintiff's hip and requested that she come back when the MRI was completed. *Id.* The doctor also noted that Plaintiff still had back pain and "SI joint arthralgia."[5] *Id.* Dr. Kabakibou's records state that the "MRI for lumbar spine area was normal," although it does not specifically note whether that MRI is the same one that occurred on September 17, 2007. *Id.*

---

[3] Facets are "small stabilizing joints located between and behind adjacent vertebrae." Dr. Charles Ray, *Facet Joint Disorders and Back Pain*, Dec. 10, 2002, http://www.spine-health.com/conditions/arthritis/facet-joint-disorders-and-back-pain (last visited September 24, 2009).

[4] These are vertebral bodies found in the spine.

[5] "The SI, or sacroiliac joint, is the joint between the sacrum, at the base of the spine, and the ilium of the pelvis, which are joined by ligaments." *Sachs v. Astrue*, No. 1:05CV106, 2008 WL 686325, at *10 n. 13 (E.D. Mo. March 10, 2008). Arthralgia is a medical term for joint pain. *Id.* at *9 n. 7.

4

Plaintiff underwent the requested MRI of her right hip on October 15, 2007, again performed by Dr. McKeown. D.E. [15], Ex. B, Part 2, RS000218. The MRI was not completed because Plaintiff "could only withstand a portion of the exam," and therefore, the exam was "quite limited." *Id.* There was "[n]o definite abnormality" involving the right hip joint, and "significant deformity of this joint is quite unlikely." *Id.* The report further noted that the MRI showed "some chronic asymmetry of the pelvic bones, assumed to be known, and probably related to the post-surgical changes involving the right SI joint."[6] *Id.*

In the medical records from Dr. Kabakibou, there also appears a "Patient Progress Questionnaire" dated October 29, 2007. D.E. [15], Ex. B, Part 2, RS000215-16. According to the questionnaire, Plaintiff's pain on that date was a seven on a scale of one to ten, the intensity of her pain had increased since her previous visit and was no less frequent, and her ability to function had not changed since the prior appointment. *Id.* at RS000215. There is also a document from the same date entitled "Attending Physician's Statement of Impair and Function," in which Dr. Kabakibou wrote that Plaintiff should never carry or lift anything twenty pounds or heavier, should only occasionally lift or carry something weighing ten to nineteen pounds, and could frequently lift or carry something weighing less than ten pounds. *Id.* at RS000255. The record further indicates that patient could use her upper extremities for grasping, pushing, pulling and fine manipulation. *Id.* Dr. Kabakibou concluded that

---

[6] Plaintiff underwent a sacroiliac fixation and fusion in 1998, an operation intended to stabilize one of the SI joints in the pelvis and relieve some lower back pain.

5

Plaintiff was not able to climb, balance, stoop, kneel, crouch, or crawl. *Id*. However, she

could occasionally reach above her shoulders, handle, finger, and feel. *Id*. On October 29,

2007, he considered her fully disabled. *Id*.

After receiving Plaintiff's medical records from Dr. Kabakibou, Defendant sent the

records to be reviewed by "an outside physician," Dr. Caroline A. Mason. D.E. [18], Ex.

2, ¶ 30. Dr. Mason reviewed the records from August 21, 2007, September 26, 2007, and

October 29, 2007. D.E. [15], Ex. B, Part 2, RS000208-10. Additionally, Dr. Mason

reviewed the MRIs from September 17, 2007 and October 15, 2007, and the Employee's

Statement and an Activities of Daily Living Questionnaire[7] completed by Plaintiff. *Id*. The

assessment by Dr. Mason, dated December 14, 2007, stated the following:

> Review of the medical record does not show clinical support for
> impairment from the claimant's occupation as [a patient care
> technician]. . . . Clinical exams do not report any need for assistive
> device such as cane and do not report abnormal findings except for
> tenderness with palpation and positive Patrick's sign[8] on 8/21/07. No

---

[7] Plaintiff completed this questionnaire in support of her claim on November 13,
2007. It stated that she suffered from "severe pain" around her "SI area" and right leg
numbness. D.E. [15], Ex. B, Part 2, RS000233. Plaintiff complained of trouble sleeping
because she could not sleep on her back or right side. *Id*. at RS000234. She also stated that
she prepared her own breakfast and lunch, but her daughter helped her make dinner for a
few days. *Id*. Plaintiff described trouble eating when she was in pain. *Id*. She further noted
that she did not do housework, could not sit or stand for long periods of time, and had to use
a cane. *Id*. Plaintiff claimed she needed someone to drive her around, and it took her longer
to get up stairs than it used to. *Id*. at RS000236.

[8] Patrick's Sign is a test used to determine whether a person might have a hip
disorder. Dan J. Tennenhouse, 2 Attorney's Medical Deskbook § 18:4 (4th ed. 2008),

abnormal exam findings were reported with clinical exam 9/26/07.
Lumbar and hip MRI reports are essentially normal . . . . In my
opinion, the claimant is able to work at her own occupation and no
limitations or restrictions are necessary for her work. In my opinion,
the claimant would be able to return to work after follow up clinic visit
with Dr. Kabakibou 10/29/07, when diagnostic testing was completed
and reported to be essentially normal.

*Id*. at RS000210.

After receiving Dr. Mason's assessment, Defendant sent Plaintiff a letter dated

January 4, 2008, approving benefits for Plaintiff only from August 21, 2007 to October 29,

2007. D.E. [15], Ex. B, Part 2, RS000195. The letter informed Plaintiff that after review of

her medical records by a consulting physician, Defendant determined that her "condition

[was] not preventing [her] from working in [her] occupation as a Patient Care Technician."

*Id*. Defendant gave Plaintiff the option of providing medical records that would show she

was not able to return to work on October 30, 2007 due to her disability, and Defendant

informed Plaintiff of her right to appeal the denial of her benefits. *Id*. at RS000196.

Plaintiff's attorney sent a letter to Defendant in March of 2008 appealing the denial

of Plaintiff's benefits. D.E. [15], Exhibit B, Part 2, RS000137. With the appeal, Plaintiff's

attorney also included another medical record from Dr. Kabakibou dated March 3, 2008, as

─────────────────

*available at* Westlaw database MEDDESK. "While supine, the heel of the foot on the tested
side is placed on the opposite knee, then the knee on the tested side is pressed down as far
as it will go." *Id*. Patrick's sign is considered positive and a possible hip disorder present
when there is "[p]ain and limited motion in the hip." *Id*.

AO 72A
(Rev.8/82)

well as a letter from Dr. Kabakibou dated January 22, 2008 stating that Plaintiff was totally disabled as of October 29, 2007 due to constant pain that affects her "function ability." *Id.* at RS000138-39. The March 3, 2008 record stated that Plaintiff still suffered from chronic pain in the lower back area, SI joint arthralgia, chronic myofascial-type pain, depression, and muscle spasms and that she was currently controlling her pain to some extent with medication. *Id.* at RS000138. The report also stated that Plaintiff's work status was that she was not able to work, and that "she continues to be totally disabled . . . ." *Id.*

After receiving Plaintiff's letter of appeal, Defendant replied to Plaintiff's attorney requesting all medical records from Dr. Lippitt[9] for the period of March 1, 2007 to March 26, 2008, any prescription records from any pharmacies Plaintiff used for the same period of time, and any medical records regarding office visits made to Dr. Kabakibou between October 29, 2007 and March 3, 2008. D.E. [15], Ex. B, Part 1, RS000133. Plaintiff responded by providing a record from an office visit with Dr. Kabakibou dated January 21, 2008. *Id.* at RS000130. The record shows that Plaintiff complained of low back pain with radiation of pain in her right leg. *Id.* She was on medication, but the medication only controlled the pain for four hours and lessened it by fifty percent – not completely. *Id.* Dr.

---

[9] Plaintiff listed Dr. Alan Lippitt as having treated her on July 15, 2007. D.E. [15], Ex. B, Part 2, RS000238. Dr. Kabakibou's initial evaluation of Plaintiff indicates that Dr. Lippitt referred Plaintiff to Dr. Kabakibou. *Id.* at RS000222.

8

Kabakibou refilled her medications and requested that Plaintiff come back for a follow up visit. *Id*. There was no mention of her ability or inability to work. *Id*.

Plaintiff sent Defendant a pharmacy report containing the medications Plaintiff was taking or had taken in the past.[10] D.E. [15], Ex. B, Part 1, RS000127-28. Plaintiff also provided a radiology record dated July 16, 2006 listing Dr. Alan Lippitt as the attending and requesting physician, which showed that "[t]wo cannulized screws traverse the left SI joint."[11] *Id*. at RS000124. The screws were from the sacroiliac fixation and fusion that Plaintiff underwent in 1998. *Id*. at RS000122. The findings of the radiology report further state that there was "partial bony fusion of the posterior right SI joint . . . [and t]he left SI joint is unremarkable." *Id*. at RS000124.

Defendant also received a report created by Dr. Michael A. Amaral and dated July 27, 2007. D.E. [15], Ex. B, Part 1, RS000122. Plaintiff complained of pain that was a seven out of ten, and she felt her back was swollen. *Id*. The physical findings are as follows:

> On examination there is exquisite tenderness to even light touch in the right paraspinal region and over the scar which itself appears well healed. Just barely touching the skin produces excruciating pain and there seems to be a dramatic representation of symptoms. . . . There is no decreased sensation to pinprick throughout lower extremities. Deep

---

[10] Some of the medications prescribed by Dr. Kabakibou include Opana, Endocet, and Lexapro. D.E. [15], Ex. B, Part 1, RS000128. Plaintiff also had a prescription for Hydrocodon from another physician, as well as some other prescriptions. *Id*.

[11] Other than the radiology report discussed in this paragraph, there seem to be no records from any visits with Dr. Lippitt.

> tendon reflexes are normal and symmetrical at the knees and ankles. There is no Babinski and no clonus.[12] The straight leg raise test is negative bilaterally. The Patrick maneuver causes some low back extreme discomfort and can barely be done. . . . On symmetry test, there seems to be an overall tilt of the pelvis with the left side down . . .although the legs are equal when measured from the ASIS[13] to the heels. This seems to be a tilt secondary to spasm and not a true asymmetry of the pelvic girdle. The back area does not appear swollen to me.

*Id*. Dr. Amaral concluded that a CT scan of Plaintiff performed on July 16, 2007 at the request of Dr. Lippitt "looks good," but that he wanted to obtain an EMG and a lumbar MRI. *Id*. Dr. Amaral also decided to "keep [Plaintiff] off work" until the EMG and MRI were performed and gave her some medication for spasms. *Id*.

After receiving this additional information, Defendant notified Plaintiff, through her attorney, that an Independent Medical Exam would be conducted with scheduling to be done by MLS National Medical Evaluating Services, Inc. D.E. [15], Ex. B, Part 1, RS000110. The Independent Medical Exam was scheduled for May 21, 2008 with Dr. Arnold J. Weil. *Id*. at RS000106, 104. Plaintiff's attorney then sent another medical record from Dr. Kabakibou dated April 21, 2008, which stated that Plaintiff complained of some problems with her short-term memory, as well as her usual symptoms. D.E. [15], Ex. B, Part 1, RS000108.

---

[12] A negative result from these two tests indicates that there are no lesions of the upper motor neurons. Tennenhouse, 2 Attorney's Medical Deskbook § 18:4.

[13] ASIS stands for the "anterior superior iliac spine." *Halsey v. Astrue*, No. 1:08cv00004, 2009 WL 187696, at *8 (W.D. Va. January 23, 2009).

AO 72A
(Rev.8/82)

The record also noted that Plaintiff's pain was "fairly controlled with the current medications" and that "she . . . is not having any adverse reactions from her medication." *Id*. Plaintiff still had low back pain, SI joint arthralgia, chronic myofascial pain, muscle spasms, and depression, as well as short-term memory loss possibly associated with a head injury of some sort. *Id*. The record does not contain any other information regarding when or how the possible head injury occurred. *Id*.

Defendant sent all of Plaintiff's medical records that it had in its possession, a job description, the Occupational Demands form provided by Piedmont, and the Activities of Daily Living form filled out by Plaintiff to Dr. Weil before Plaintiff's examination. D.E. [15]. Ex. B, Part 1, RS000102-03. Accompanying the medical records was a letter requesting that Dr. Weil review Plaintiff's medical records, perform an examination on Plaintiff, and then answer the following questions:

1. Please summarize your review of the records and your examination of Ms. Davis.
2. Do you agree with Ms. Davis' diagnosis?
3. Is Ms. Davis receiving appropriate care and treatment to help manage her pain? Do you have any treatment recommendations?
4. How would you rate the severity of Ms. Davis' pain?
5. Is Ms. Davis experiencing significant functional impairments as a result of her condition and her pain? If so, please explain.
6. Was Ms. Davis capable of performing the essential duties of her occupation as a Patient Care Technician, as outlined in the enclosed job description and Occupational Demands form, on a full-time sustained basis as of 10/30/07? Please provide the rationale for your opinion.

7.     If your response to question 5 was, "Yes", what if any restrictions would Ms. Davis have in her ability to perform the essential duties of her occupation as a Patient Care Technician on a full-time sustained basis as of 10/30/07?

*Id*. Plaintiff attended the appointment with Dr. Weil as scheduled. *Id*. at RS000101.

After examining Plaintiff, Dr. Weil sent a letter to National Medical Evaluation Services answering the above-stated questions and detailing his examination and review of Plaintiff's medical records. D.E. [15], Ex. B, Part 1, RS000090-97. National Medical Evaluation Services sent that letter to Defendant. *Id*. at RS000090. On the day of her visit, Plaintiff complained of back pain, stating that her pain averages a six out of ten on most days, although sometimes her pain is only a four or five, while other times it is a ten out of ten. *Id*. at RS000092. Plaintiff also complained of weakness, joint swelling, joint pain, joint stiffness, leg pain, and difficulty walking. *Id*. at RS000093. Plaintiff reported "being independent in her activities of daily living including dressing, bathing, feeding, grooming, and toileting, but does not drive because 'the right leg is shorter and it increases her pain." *Id*. at RS000092. The report states that Plaintiff was on Provigil, Opana, Xanax, and Percocet. *Id*. Dr. Weil also noted that Plaintiff walked with a cane. *Id*. at RS000093.

Dr. Weil examined Plaintiff's lumbar spine and found that she had limited flexion, extension and rotation "with severe exaggeration with movement." D.E. [15], Ex. B, Part 1, RS000093. She was also tender to the touch on her right lower back, with "exaggeration

12

of pain responses." *Id.* Dr. Weil also performed a straight leg raise test, and it was negative.[14]

*Id.* Dr. Weil stated in his letter that there was "negative fabere."[15] *Id.* When describing the

neurological test he did on Plaintiff, Dr. Weil observed "numerous inconsistencies" in his

examination. *Id.* Dr. Weil also noted that Plaintiff "has marked Waddell signs[16] including

---

[14] A straight leg raising test is used to determine whether there might be "compression of the L4–L5 or L5–S1 spinal nerve roots, as with intervertebral disc rupture." Tennenhouse, 2 Attorney's Medical Deskbook § 18:4. The test is positive if there is pain in the sciatic nerve and is performed by having the patient, "while supine," extend her knee and elevate her leg by flexing their hip. *Id.*

[15] Fabere's Sign is the same as Patrick's Sign. Tennenhouse, 2 Attorney's Medical Deskbook § 18:4. "FABERE stands for Flexion, Abduction, External Rotation in Extension." *Id.*

[16] There are eight Waddell signs:
1. Superficial skin tenderness. Physical causes for back pain do not produce skin pain or tenderness (pain with light touch).
2. Non-anatomic pain. Physical conditions that cause pain affect specific involved structures and do not cross boundaries beyond those structures. When the distribution of the pain crosses anatomical boundaries into regions of structures that are not affected, the pain cannot have a physical cause.
3. Simulation of spine loading (axial loading). While the patient is standing, downward pressure on the top of the head cannot produce back pain due to physical factors. Only functional back pain will increase. . . .
4. Simulated rotation. When the shoulders and pelvis are rotated together in a standing patient, there is no stress on the back. Back pain from this maneuver is functional. . . .
5. Distraction straight-leg raising. Distraction tests are positive where the pain is not consistent between different versions of the same action. If a straight-leg raising test produces back pain, the same pain should occur with the patient sitting and one knee extended straight out. Patients with purely functional pain are unaware of this and describe no pain while in a sitting knee-extended position. . . .
6. Regional sensory change. Numbness that does not follow anatomical nerve

13

exaggeration of pain responses and hypersensititvity with complaints of pain with light stroking and touch over the leg. She has pain with axial loading, rotation en bloc, and giveaway weakness into her lower extremity, also positive distraction test."[17] *Id.* at RS000094.

Dr. Weil then summarized the medical records he reviewed and concluded his letter by answering the questions from Defendant's letter. D.E. [15], Ex. B, Part 1, RS000094-96. Dr. Weil agreed that Plaintiff's previous diagnosis of sacroiliac joint dysfunction was

distributions..., cannot be due to nerve impingement. Such a non-anatomical pattern is sometimes called a "stocking" sensory loss, and is almost always due to functional complaints.
7. Regional weakness. Loss of muscle strength, like skin sensation, follows anatomical nerve distributions. Weakness in combinations of muscles that are not innervated by the same spinal nerve roots or peripheral nerves cannot be explained anatomically.
8. Over-reaction. Inappropriately large pain reactions to mild touching during physical examination also indicate to an experienced clinician that the patient's stated symptoms do not correspond to the effects expected from a physical abnormality.

Tennenhouse, 2 Attorney's Medical Deskbook § 18:4. The signs are "caused by non-anatomical (functional) factors and implies that the back pain has no physical cause." *Id.* The presence of one or two Waddell signs indicates that the patient may be anxious or eager to cooperate. *Id.* "Three or more are usually considered sufficient to make a diagnosis of functional disorder or deliberate deception (malingering) and to rule out physical abnormality."

[17] A positive distraction test signifies that "[t]he membrane that runs longitudinally along the roof of the cervical spine (tectorial membrane) is lax and allows excess movement of the vertebral joints." Tennenhouse, 2 Attorney's Medical Deskbook § 18:4. A positive test is indicated by pain or parethesis when the doctor "lifts the patient's head, flexing the neck, then applies traction to the head" while the patient is supine. *Id.*

AO 72A
(Rev.8/82)

consistent with his examination. *Id*. at RS000095. He found Plaintiff's previous care and treatment to be appropriate, and he did not recommend any additional treatment "in lieu of marked exaggerated responses with Waddell signs and a complete diagnostic work up already being performed." *Id*. Dr. Weil rated the severity of Plaintiff's pain as "moderate from her standpoint," but in his opinion, due to inconsistencies in her examination, her pain was more mild. *Id*. at RS000096. Furthermore, while Plaintiff was "experiencing significant functional impairments as a result of her pain," the impairments are inconsistent with her injury. *Id*. Plaintiff's "functional impairments appear to be exaggerated and inconsistent with her injury and the underlying findings." *Id*. Dr. Weil concluded that Plaintiff was able to perform the essential duties of her own occupation as a patient care technician as of October 30, 2007. *Id*.

After Dr. Weil completed his report, Defendant informed Plaintiff's attorney that it received an additional medical record from Dr. Kabakibou and had "become aware of the 4/28/08 MRI report." D.E. [15], Ex. B, Part 1, RS000086. Defendant requested that the MRI report be sent to Defendant and informed Plaintiff's attorney that both the new medical record from Dr. Kabakibou and the MRI report would be sent to Dr. Weil "to ensure that he has considered all [Plaintiff's] medical records through 5/21/08." *Id*. Plaintiff's attorney sent the MRI report which noted Plaintiff's lumbar vertebral bodies were within normal limits, the vertebral body bone marrow appeared normal, and no evidence of compression

15

deformity was seen. D.E. [18], Ex. 2, ¶ 66. Furthermore, Plaintiff's L1-L2 appeared normal; her L2-L3 appeared normal with only minimal disc dehydration; her L4-L5 had very minimal disc bulging with mild disc dehydration and mild facet hypertrophy; and her L5-S1 had no evidence of large disc herniation. D.E. [15], Ex. B, Part 1, RS000067. The May 19, 2008 record from Dr. Kabakibou summarized the MRI and noted that Plaintiff continued to have significant back pain. *Id*. at RS000069. The record further stated that Plaintiff asked if there were procedures available to help ease her pain because she had a facet joint block at some point, which was moderately helpful. *Id*. Dr. Kabakibou renewed Plaintiff's prescriptions. *Id*. at RS000070. To further help Plaintiff manage her pain, Dr. Kabakibou scheduled her to both undergo "radiofrequency thermocoagulation . . . " and to receive a lumbar epidural steroid injection. *Id*.

Dr. Weil reviewed the April 2008 MRI as well as the May 2008 medical record from Dr. Kabakibou. D.E. [15], Ex. B, Part 1, RS000051. Review of these documents did not change Dr. Weil's opinion that Plaintiff was capable of performing the essential duties of her occupation as a patient care technician. *Id*. Based on its review of Plaintiff's medical history, including the opinions of Dr. Kabakibou, and the opinions of two independent doctors, Dr. Weil and Dr. Mason, Defendant again denied Plaintiff's claim for long term disability benefits after October 29, 2007.

16

After Plaintiff's appeal was denied, she brought suit against Defendant[18] in the Superior Court of Fulton County. She alleged that Defendant breached its contract by terminating Plaintiff's benefits and refusing to grant long term disability benefits to her. Plaintiff requested all benefits due to her under the Plan, costs and attorneys' fees, and a trial by jury. Defendant removed the action to this court based on the assertion that Plaintiff's complaint is governed by the Employee Retirement Income Security Act (ERISA). Defendant filed the present motion for summary judgment on June 22, 2009.

## B.    Contentions

Defendant seeks summary judgment on all of Plaintiff's claims. First, Defendant claims that under the relevant law, its denial of Plaintiff's claim was not an abuse of discretion. Defendant alleges that its determination based on a review of Plaintiff's medical history was not wrong, and it was a reasonable exercise of its discretionary power. Furthermore, Defendant argues that there is no evidence that Defendant's denial was tainted by self-interest. Finally, Defendant argues that ERISA preempts Plaintiff's request to recover attorneys' fees and litigation costs pursuant to O.C.G.A. § 13-6-11. Defendant provided the court with Plaintiff's claim file, which contains all the material it considered when determining the outcome of Plaintiff's claim request.

---

[18] Plaintiff also sued Piedmont Healthcare, Inc. and Unum Life Insurance Company of America, but those parties were dismissed by stipulation of the parties. D.E. [8], [9].

Plaintiff argues that Defendant failed to adequately consider all the relevant factors when considering whether to give Plaintiff benefits, and the decision denying those benefits was wrong in light of the determination by Plaintiff's treating physician that she was completely disabled. Plaintiff further argues that her reports of pain were credible, some of the medical records do not contain relevant information, and all of the doctors agree that she was properly diagnosed with sacroiliac joint dysfunction and properly treated by Dr. Kabakibou.

## II.    Discussion

In ERISA cases, where there is no other basis for subject matter jurisdiction, federal courts only have subject matter jurisdiction over state law claims that have been "superpreempted" or completely preempted, but not necessarily those that are "defensively preempted."[19] *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1212 (11th Cir. 1999). If there is complete preemption, "courts are required to recharacterize the [state law] claim as one arising under federal law for purposes of determining removal jurisdiction." *Engelhardt v. Paul Revere Life Ins. Co.*, 139 F.3d 1346, 1353 (11th Cir. 1998). Superpreemption under ERISA exists when four factors are present:

---

[19]Defensive preemption "originates in ERISA's express preemption provision, 29 U.S.C. § 1144(a). Defensive preemption provides only an affirmative defense . . . [and] does not furnish federal subject-matter jurisdiction under 28 U.S.C. § 1331 . . . ." *Id.* Therefore, defensive preemption does not satisfy the well-pleaded complaint rule because a defense cannot be the basis for removal to a federal court. *Caterpillar Inc. v. Williams*, 483 U.S. 386, 393 (1987).

First, there must be a relevant ERISA plan. Second, the plaintiff must
have standing to sue under that plan. Third, the defendant must be an
ERISA entity. Finally, the complaint must seek compensatory relief
akin to that available under § 1132(a); often this will be a claim for
benefits due under a plan.

*Butero*, 174 F.3d at 1212 (internal citations omitted).

Here, Plaintiff seeks to recover benefits she alleges were wrongly denied to her, and

her costs and attorneys' fees associated with this action. Defendant removed to this court on

the basis that ERISA preempts Plaintiff's state law breach of contract claim. Plaintiff does

not dispute that ERISA applies. There is a relevant ERISA plan: the group policy

administered by Defendant. 29 U.S.C. § 1002(1). Plaintiff has standing to sue under 29

U.S.C. § 1132 because she is a plan participant trying to recover benefits she alleges are due

to her under the plan. *See Butero*, 174 F.3d at 1212-13. Defendant is an ERISA entity

because it could and did "control . . . the payments of benefits and the determination of

[Plaintiff's] rights" under the plan. *Id*. at 1213. And finally, Plaintiff is attempting to recover

exactly that relief that is available under § 1132: benefits allegedly due under the group

policy. *Id*. Therefore, this court has subject matter jurisdiction.

Even though complete preemption provides this court subject matter jurisdiction, it

does not automatically mean that ERISA preempts Plaintiff's state law breach of contract

claims, requiring substantive ERISA law to be applied. *Ervast v. Flexible Prods. Co.*, 346

F.3d 1007, 1014 (11th Cir. 2003). While ERISA generally requires defensive preemption

of all state laws, 29 U.S.C. § 1144(a), there are some exceptions found in 29 U.S.C. § 1144(b)(2)(a) and 29 U.S.C. § 1003. However, none of these exceptions apply to the present case, and therefore, ERISA preempts Plaintiff's state law breach of contract claim, and this court will apply the relevant federal law.

The Eleventh Circuit has enumerated a six-step analysis to be taken by district courts when reviewing plan administrator's decisions denying benefits under ERISA:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.
>
> (3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.
>
> (5) If there is no conflict, then end the inquiry and affirm the decision.
>
> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Doyle v. Liberty Life Ins. Co. of Boston*, 542 F.3d 1352, 1356 (11th Cir. 2008). The court is limited to those facts that were known to the administrator at the time the decision

20

regarding benefits was made. *Glazer v. Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008). It is the court's job to "review both the administrator's construction of the plan and concomitant factual findings." *Id.*

This court must first decide whether Defendant's decision was wrong. "A decision is wrong if, after review of the decision of the administrator from a de novo perspective, the court disagrees with the administrator's decision. The court must consider, based on the record before the administrator at the time its decision was made, whether the court would reach the same decision as the administrator." *Glazer*, 524 F.3d at 1246 (internal quotations and citations omitted). In *de novo* review, this court first examines the plan itself. *See* 29 U.S.C. § 1104(a)(1)(D).

A participant is "disabled" and can receive long term disability benefits under the policy where Defendant determines that "[a] change in [the employee's] functional capacity to work due to accidental injury . . . has caused . . . [the employee's] inability to perform the essential duties of [her] regular occupation." D.E. [15], Ex. A, 16. A description of Plaintiff's job demands was provided by her employer and included twelve hour days, three days a week, during which Plaintiff must have been able to carry one to five pounds twelve times a day, lift six to ten pounds twelve times a day, lift twenty-six to fifty pounds thirty times per day, and carry one hundred pounds twice a day. D.E. [15], Ex. B, Part 2, RS000241. Plaintiff's job also required her to spend twenty percent of her day sitting, thirty

21

percent standing, and fifty percent walking, as well as significant stooping and reaching above the shoulders, often reaching below the shoulders, but seldom using stairs or kneeling. *Id*. Plaintiff's employer also noted that Plaintiff must perform her job at a rapid pace most of the time. *Id*.

This court must determine whether Plaintiff's medical problems were severe enough to make her disabled under the definition of the group policy administered by Defendant. There is conflicting information regarding Plaintiff's ability to perform the aforementioned tasks, the "essential duties of her regular occupation." Plaintiff's treating physician repeatedly concluded that Plaintiff was completely disabled and unable to perform her work starting on October 29, 2007 and continuing through the length of Plaintiff's appeal. On the other hand, Dr. Mason and Dr. Weil concluded that Plaintiff was not disabled and could perform the essential duties of her regular occupation. Dr. Weil went so far as to say that Plaintiff was exaggerating her pain and symptoms, and her pain was likely mild. He found the presence of at least four Waddell Signs, D.E. [15], Ex. B, Part 1, RS000094, which indicates that Plaintiff was intentionally deceiving Dr. Weil regarding the extent and nature of her injury. Tennenhouse, 2 Attorney's Medical Deskbook § 18:4. There were also several MRIs and a CT scan, all of which were essentially normal or only showed minor issues.

Plaintiff first argues that ReliaStar did not adequately consider all relevant factors in denying Plaintiff's benefits and that Defendant gave "too little weight" to the fact that the

22

effects of her pain medications were "a true debilitating factor." D.E. [18], ¶ 1. However, Plaintiff offers no evidence and points to nothing in the record that supports her argument that Defendant did not consider her medication. The record is replete with notations regarding the prescriptions Plaintiff was on throughout the relevant time period. Dr. Mason and Dr. Weil both reviewed Plaintiff's medical records, including the records from Plaintiff's treating physician. Plaintiff points to nothing in the record that shows that Dr. Mason and Dr. Weil ignored the types of medication Plaintiff was on and the side effects of those medications. Furthermore, none of Dr. Kabakibou's assessments of Plaintiff state that the effects of her medicine were part of the reason she was disabled. In fact, in one record, Dr. Kabakibou states that Plaintiff herself said she was experiencing no adverse effects from the medication beyond drowsiness. D.E. [15], Ex. B, Part 1, RS000108. Plaintiff has not satisfied her burden of showing that she was disabled due to the effects from her prescription medication.

Plaintiff also argues that Dr. Kabakibou's determinations must be given more weight than Dr. Mason's because Dr. Mason did not examine Plaintiff. Dr. Kabakibou's determination is not entitled to deference solely because he is Plaintiff's treating physician. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). Furthermore, while there may have been no physical exam, Dr. Mason reviewed all of Dr. Kabakibou's notes and assessments, as well as the rest of the medical records provided by Plaintiff, before

concluding Plaintiff was not disabled. Plaintiff has provided no case law or other support for her proposition that Dr. Mason's failure to do a physical exam means Dr. Mason's opinion deserves less consideration. Additionally, Dr. Weil did in fact examine Plaintiff and still determined that she was not disabled.

Plaintiff further argues that Dr. Amaral's decision to keep her off work until she had an MRI shows that she was disabled. However, Dr. Amaral did not determine that Plaintiff was disabled. He merely requested Plaintiff not work until he could have her do an EMG and lumbar MRI. Furthermore, Plaintiff was paid benefits from August 21, 2007 to October 29, 2007 – a time period encompassing the date on which Plaintiff saw Dr. Amaral. Defendant does not deny that Plaintiff was disabled during the time Dr. Amaral examined her. Plaintiff fails to show that Dr. Amaral's decision proves that she is disabled.

The next argument offered by Plaintiff regards Dr. Weil's determination that Plaintiff was exaggerating her pain responses and showed Waddell signs. Plaintiff says that she was forced to wait, sitting, for a long period of time, and this caused her to be "sensitive to the touches of Dr. Weil and his assistant." D.E. [18], Ex. 3, ¶ 3. Plaintiff also seems to contend that Dr. Weil's examination was short and not very thorough. The court's duty is to view the facts that were available to Defendant when making the determination regarding Plaintiff's benefits. *Glazer*, 524 F.3d at 1246. Plaintiff offers no evidence to show that Defendant was aware of how long Plaintiff waited on Dr. Weil, and it is not in the claim file provided by

Defendant. Also, while Dr. Weil's letter does not explicitly show what tests he performed, it shows that he tested Plaintiff's vitals, gait, "HEENT," cervical spine, thoracic spine, lumbar spine, extremities, muscoloskeletal system, pulse, skin, and neurological system. D.E. [15], Ex. B, Part 2, RS000080-81. Nothing in the record shows Dr. Weil's examination was not thorough, and Plaintiff points to no supporting evidence other than her opinion, which Defendant did not have at the time it reviewed Plaintiff's claim.

Plaintiff also argues that the MRI of her hip that was never completed is unreliable. However, Defendant did not base its determination solely on this MRI, and the MRI results that were obtained showed no defects, and the physician reviewing the MRI results further stated that even though the results were quite limited, "significant deformity of this joint is quite unlikely." D.E. [15], Ex. B, Part 2, RS000218. One incomplete MRI in Plaintiff's long medical history is not enough to show that Defendant's decision was wrong.

Finally, Plaintiff argues that "[a]ll of the doctors that reviewed Ms. Davis' treatment and record agreed that Ms. Davis' treatment was adequate and none disagreed that Ms. Davis required the prescribed medication to control her pain." D.E. [18], ¶ 2.C. Plaintiff misunderstands the determination this court must make. The issue is not whether Plaintiff suffered from legitimate lower back pain and needed the medications prescribed. The issue instead is whether Plaintiff's medical problems were severe enough that she should be considered unable to perform the essential functions of her job as a patient care technician.

That Drs. Mason and Weil agreed that Plaintiff's diagnosis and treatment were proper does not change their ultimate conclusions that Plaintiff was not disabled.

Taking the relevant record in total, this court cannot say that it would have reached a result different from Defendant. Plaintiff does not establish any genuine dispute regarding a material issue of fact, and Plaintiff fails to establish that she was in fact disabled and unable to perform her own occupation. Therefore, this court finds that Defendant's denial of Plaintiff's benefits was not "wrong."

In the alternative, even if Defendant's denial was in fact wrong, it could be saved if the Defendant "was vested with discretion in reviewing claims," and there are reasonable grounds supporting that decision. *Doyle*, 542 F.3d at 1356. The Eleventh Circuit reviews this decision for reasonableness under the "deferential arbitrary and capricious standard." *Id*. Both parties admit that Defendant retained discretion in deciding whether an employee is disabled under the terms of the group policy. D.E. [18], Ex. 2, ¶ 8.

Defendant considered a wide range of information in making the determination denying Plaintiff benefits. Defendant reviewed the continued opinion of Dr. Kabakibou that Plaintiff was completely disabled, and in fact, provided Plaintiff with benefits for August 21, 2007 through October 29, 2007 based on Dr. Kabakibou's assessment. Defendant also reviewed the determinations by several physicians that Plaintiff's MRIs and CTs were essentially normal and showed no severe injury. Furthermore, Defendant reviewed the

26

reports of two independent doctors, Dr. Mason and Dr. Weil, both of whom concluded that Plaintiff was not disabled. Dr. Weil even went so far as to suggest that Plaintiff was exaggerating her pain and symptoms. After Plaintiff appealed the denial of her benefits, Defendant sought the Independent Medical Exam by Dr. Weil, even after having already requested an independent review by Dr. Mason. As Plaintiff sent updated records throughout her appeal, Defendant reviewed those records and sent them to Dr. Weil to ensure that his decision was based on all of the information available to Defendant. Defendant's actions in reviewing the claim were reasonable, and the decision it reached was reasonable based on the conflicting information before it. Therefore, under the deferential arbitrary and capricious standard, this court finds that Defendant acted reasonably in denying Plaintiff's long term disability benefits.

This court must also consider any conflict of interest Defendant had that may have affected its decision. *Doyle*, 542 F.3d at 1356. Defendant admits that it has a conflict of interest because it "both funds the benefits payable after the first 180 days and also because it is the claims decisionmaker." D.E. [15], Ex. 5, 24. Plaintiff, however, does not address this conflict, and Plaintiff has the burden of showing that the insurer's conflict of interest affected Defendant's decision. *Mattox v. Life Ins. Co. of North America*, 625 F.Supp.2d 1304, 1309 (N.D. Ga. 2008) (Batten, J.). As Plaintiff offers no argument that Defendant's decision was compromised by the conflict of interest, Plaintiff has failed to meet that

burden. Therefore, there is no evidence to show that Defendant's admitted conflict of interest affected Defendant's decision.

After a review of the information available to Defendant when determining whether Plaintiff was disabled, the court finds that Defendant's decision was not wrong, and Defendant's discretionary decision was reasonable.

## III.    Conclusion

The court GRANTS Defendant's motion for summary judgment [15]. Defendant's motion to strike Plaintiff's jury demand is DENIED as moot [16]. The Clerk of the Court is DIRECTED to DISMISS WITH PREJUDICE Plaintiff's complaint.

**IT IS SO ORDERED** this 16th day of October 2009.


_____/s J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)